Good morning, Your Honors. I think that the question of extraterritorial with respect to the application of the Rousseau case is not relevant when you are talking about interstate workers. When you come to the regulation of interstate employment, it's not sufficient to ask whether the relevant law was intended to operate extraterritorial. A better question, as cited in the evolving case law, is what type of connections you have to California to trigger the relevant provisions of California law. Counsel, if these events had occurred in Nebraska instead of on the high seas, we wouldn't be asking those questions. We would say California law doesn't apply to things that happen in Nebraska. Why should it be any different when it's outside the territorial waters? Well, the Northern District of California in Stouffville applied FIHA, California law, to a worker in Nashville, Tennessee, who was hired from a California corporation, and the termination took place from California, and they identified the individual who made the termination. And in this case, the termination, of course, occurred, the final one, in Oakland, California, from the director of the Labor Relations Board for Matson. So in many cases, when you have remote workers or interstate workers, you have to expand the scope of the FIHA. When FIHA was passed, of course, we didn't have interstate workers or remote workers. So in this case, we've now expanded the law, and of course, when you have a merchant seaman, there's no issue of conflict with any other state if you're concerned about the sovereignty of the states. So if the court wanted to establish a general maritime law for discrimination, as it did, as the court has the power to do under Article III, Section 2, such as Morang v. U.S. Lines or Insurance Company v. Dunham, it could establish, as Atlantic Soundings v. Townsend for legislative history of FIHA, do they discuss extraterritorial. In fact, the case cited by the lower court in Arco v. Campbell first said, well, the person was non-resident of Washington, I mean, was a resident of Washington, non-resident of California, but then it says, well, therefore, it doesn't apply, but there's no residency requirement in FIHA. So if I were to possibly... Right, but under the test, even in the cases that you cite, Ward and Sexton, the court rejected the use of residency as a factor. They said, in that case, they relied on the fact that the pilots and flight attendants had an officially designated home base in the state. At this point, even under this test, what would be the permissible things we could consider that establish the sufficient connection to California? Well, on page 2 of our, I guess, in our opening brief and our reply brief, we went through all of Mr. Kane's connections with page 360 through 373. Out of the 14 times he shipped with Mattson, he reported in California, either San Francisco, Oakland, or Long Beach. Two times, he reported in Salvador and once in Hawaii. Of course, Mattson had to fly him to those foreign ports because he's a California resident. He pays California taxes. Mattson pays into state disability for California. And he filed for unemployment when he was discharged. And Mattson availed itself of California loss, unemployment loss, and opposed it. So it doesn't seem fair that Mattson could... Right, but the residency is already something the court said we shouldn't consider. I'm sorry, what? The residency and the taxes is already something I understand that the California Supreme Court said are factors we should not consider. So that leaves the fact that I think he departed from California some of the times. Is there any evidence that California was designated as his official home base? Well, I don't know if there's a designation as official home base, but his residence, his union hall is at Sailor's Union Pacific here in San Francisco. And that's where he throws in his car, pulls his jobs. So he's always reported for the 14 times he shipped with Mattson in the last couple years, 12 of them were shipping out of California. So he always reported to work in California. And Sexton indicated that it's actually the, not only that was more or less ward that says where you report to work, but Sexton says it's the final termination, which was also in California. Well, I understood he was terminated actually while he was on the high seas, wasn't he? Well, the letter of warning came in the high seas and as they were approaching Guam, which is just a port. He doesn't work out of Guam. And then he was terminated with, after the letter of warning, he was given a letter of termination, which he had to leave the ship and they flew him back. He's required to be repatriated back to a ship. So he's repatriated back to his place of reporting for work. So, and then thereafter, two days later, he received the the ban or the two year ban for termination for two years. So, so I think that the court has to bring itself to consider that we have interstate workers. I was, I don't know if this is a good hypothesis, but suppose this court was sitting in the Sandro Day Connor Courthouse in Phoenix and it brings its court staff there. And then there's an act of discrimination. Well, the act of discrimination, of course, was in Phoenix, Arizona. The reporting to work was in Arizona, but the staff is only there for one day to hear territorial. It's a different age where people are working remotely or they're in interstate commerce. Now the pilots fly through many different states. Sometimes the pilots don't even report they have to fly to Atlanta to pick up their plane, yet they're based in California. So it's a whole different type of theory after applying FIHA. So you have Mr. Kane, who is covered to territorial waters. I wrote 12 miles. I think it might be only three miles under government code 170. All of a sudden he's not covered by anything. In other words, the cases in the case we cited, the subsequent citations, we cited that if effectively, if they work in many jurisdictions, they have no protections. Well, counsel, there are remaining claims in the case that are unrelated. So I'm not sure it's accurate to say that he has no other recourse for alleged wrongs. That's true, but the other claims are for lost wages, double wages for not being paid. The other claims are for defamation, emotional stress, and maintenance and cure, which is a maritime case. We also, what was dismissed was the breach of contract case and the applied breach of good faith and fair dealing. With respect to the contract case, this is, I believe it's maritime law, and you have to look at the Cossack versus United Fruit, where there was an oral agreement. In other words, maintenance and cure is general contractual. All it essentially does is promise that if you keep acting bad, they'll fire you, but it doesn't seem like what we would ordinarily think of as a contract. It says that they have to comply with the ship's, the specific ship's rules. I can't pronounce it, Kaimanahila rules, and those are ship's rules. And so they, those are additional rules imposed by the captain. So if the court asks me, it says, we want you to amend your table of contents. If you don't do it in five days, we're going to dismiss your case. And I said, okay, I'll do it. And before I can do it, you dismiss my case. Wasn't that a subset agreement of the appellate rules and the circuit rules? So that's the way I look at it, that that was an oral contract, just like in Cossack, where there was an obligation to provide medical treatment at the public hospitals. But he made an oral agreement that if, in fact, it was negligent, that we'll pay for private, private medical doctors. It was negligent, and the court upheld it, and the United States Supreme Court upheld it and said, of course, oral agreements are valid. This is a written agreement, which he signed. So that's a modification of a pre-existing obligation. So the only thing, if there's no more questions, the lower court never ruled on the statute of limitations in Del Castello for six months on a CBA, collective bargaining agreement. And it appears after the United States Supreme Court ruled in Wong that these statute of limitations are stated, so we will borrow from other statutes. However, Wong said that if, basically, if Congress hasn't clearly stated the statute of limitations, then at most, it's a claim processing rule. And so in this case, even though the court really never decided it, any claim that would come under the collective bargaining agreement appears to be as decided by the Fifth Circuit. And this circuit in Marx versus—I didn't cite that—Marx versus Holozovsky argued last year, 33 fed forth, 1157 and 1163. The time limit is just a claim processing. Take—if the defendant wanted to challenge it, they could challenge it on summary judgment. Counsel, did you want to reserve time? Yes, I do. I'm sorry. I don't have any more. Thank you, Your Honor. Good morning, Your Honors. Mike Guasco on behalf of APALE. Mr. Kane applied for a job in Hawaii. He was accepted for a job in Hawaii. He was flown by Matson from Hawaii to California, where he boarded a ship that then went out immediately into international waters. He complains about harassment and bullying that occurred in international waters. He complains about a letter of warning that happened in international waters. And then he complains about a letter of termination that was given to him in Guamanian territorial waters. The only connection that this case has to California is that that's where Mr. Kane boarded the ship. None of the conduct— Well, what about the letter coming out of Oakland? The letter coming out of Oakland, Your Honor, was just ratifying what had already happened. And the cases that talk about ratification, it's important that all of the cases use the and conjunction instead of the or. That in order for a decision-making process in California to be enough to meet a connection for FEHA—and this is the Stovall case—it talks about being directed and ratified. And there's no evidence here in the record that anything other than international waters that says that it was directed by Mattson in Oakland. There's nothing that says that anybody in Oakland was consulted prior to the termination. Rather, the letter of termination was given by Captain Bernhard in Guamanian waters. So it's not enough to say that because some paperwork came from Oakland that that suddenly means that the doors to any California court are thrown open. Counsel, I do have a question related to what opposing counsel asserted. If California law does not apply, then although there are some other theories here, there would presumably be no statutory or common law protection for bullying and retaliation, which is essentially the FEHA claim. Is that correct? And if so, is it a so what? So I would say first, no, that's not correct. And as a matter of fact, the court below and the transcript of the argument on the final motion is included in the record. And this Court may notice that Judge Orrick actually specifically suggested that a request to amend the complaint to assert Title VII, that he would consider that. For reasons that are not clear to me, Appellant did not take the Court's suggestion. Possibly it's the higher damages that they're hoping for, the caps imposed by Title VII, but it's not accurate to say that it's FEHA or nothing because there is Title VII. Additionally, there are provisions for harassment and bullying when they cause physical symptoms under the able-bodied semen provisions of the Jones Act. So to the extent that bullying ever becomes so pervasive that it causes physical symptoms, now all of a sudden you've got a claim for personal injury under the Semens Act, which, as this Court has noted many times, is almost equivalent to the railroad workers. There are cases that have upheld a FELA cause of action for bullying that leads to physical symptoms. So that's the answer to the first half of the question, Judge Graber, is no. I respectfully disagree with my colleague that it's FEHA or nothing. Even if this Court disagrees with me on that, that isn't enough to say that California now suddenly has a right to reach not only into other states, but into international waters, but into territorial waters. What if this had happened in Japanese territorial waters? Should California have a right to reach into Japan and tell them how to operate their employment system within their territorial waters? And that brings me back to kind of the overall arching principle that this case really applies. This Court, the U.S. Supreme Court, up, down, and sideways has said extraterritorial application of state law raises serious constitutional questions. Campbell, Russo, Stovall, there are cases that are legion that talk about the issue that California cannot reach out of the state. And the Supreme Court recently addressed that in the issue of pig grazing. And what is regulation within the state versus without the state? And the Supreme Court said that application of California law in that case is permissible because it only regulates conduct within the state of California, namely the sale of pork and how it had to have been raised to allow that pork to be sold within the state of California. There's nothing here that gives that type of a hook. Additionally, my colleague has said that remote work is relatively new. And I agree with him on that. Remote work is relatively new in the way that we know it. I mean, we all remember the days of going into the office five days a week, and quite frankly, that's not the reality anymore. Sotomayor Some of us still do. Breyer Then I should say that's not the reality for everybody. How about that, Your Honor? Yet to say that FEHA was passed with no consideration of merchant mariners defies logic. Merchants on the high seas is probably one of the oldest professions in mankind. And to say that, oh, the California legislature could not have imagined that people were going to get on ships and transport goods from one place to another simply ignores reality. That merchant seamen have been with us since before this country was founded. And as a matter of fact, the first U.S. Supreme Court cases are almost exclusively admiralty cases. Yet there's nothing that the California legislature has ever said that, hey, we think it's important that these people that have been doing this work for hundreds, if not thousands of years, that they should be covered. And in fact, California courts have said the opposite. They've said residency, as Judge Sung you noted earlier, Ward specifically said residency of the employee and employer are not relevant to determining whether California law applies. Rather, it's where the principal place of work is. And as the court asked my colleague, is there anything in the record about where his home base is? And my colleague said that the record shows that 12 of 14 times he boarded in California. I don't think that's actually in the record. I don't remember it being in the record. And I tried to look quickly when I saw that and could not find it. So I don't think that's in the record. I think what's in the record is he applied for a job at the Union Hall in Hawaii, got it in Hawaii, and then was flown from Hawaii to California. That's not enough to say that California law should apply. There's got to be more of a connection. And his residency is not enough. And my colleague takes issue with because of the fact that in Campbell, the plaintiff was a non-California resident. But that's not all Campbell said. Campbell said, not a California resident, and then went on to say all of the things that Ward specifically approved of. Here, there's no evidence that Long Beach or California can be considered Mr. Kane's home base. If there is a home base, it would be Hawaii. That's where he got the job and started his responsibility to Mattson. When he boarded a plane to fly to California, he was under Mattson's control and required. Took that flight to California because that's where the ship was in Long Beach? That's where the ship was going to depart, Your Honor. I don't know if there's anything in the That's where he was supposed to board the ship and start his work. That's correct, Your Honor. Thank you. So I realize I apologize if it sounded like I was dicing. I just wanted to make sure I was answering your question accurately based on what actually is in the record. Now, I want to come back to something, Your Honor, Judge Tashima, that you mentioned and that my The record does not support that. The termination letter was issued by Captain Bernhardt, signed by him, and it was attached as an exhibit to the complaint and specifically said that the decision was made by personnel aboard ship. It actually says that in the letter. And that his conduct prevented the good operation of the ship. If the court doesn't have any other questions about FEHA, I'd like to move very quickly to the contract causes of action. Hearing nothing, so I'll move over there. Judge Graber, you hit on it when you asked a very pointed question. How is a letter of warning a contract? The way I see Appellant's argument sort of blends two different concepts, so I really think we need to separate them back out. Either counsel is asserting that there is a contract under California law, and if that's the case, this case is easy. Because California courts have repeatedly said it does not make sense to say that a letter of warning could ever be an employment contract because it would have the perverse incentive of encouraging employers to not try and correct behavior and to go straight to termination. Because if warning somebody can turn into a complaint, excuse me, into a contract, then how would any employer ever take that risk? If counsel is saying that we should look to maritime law, I would note that counsel has not suggested a single case in which any court has suggested that a letter of warning could ever be considered a contract under maritime law. And because of that, we've got to go back to basic principles, and Justice Scalia in earlier cases talked about how we establish admiralty common law. We look to general principles of fairness and what the law should do. And if that is the case, the logic of California and nearly every single state and federal court that has addressed this issue under state contract law, the principle is the same. We don't want to encourage employers to go straight to termination. Lastly, the issue of preemption. The reply brief talks very briefly about Mr. Kane reaching out to the union and asking the union essentially to go back and look and makes the suggestion that the statute of limitations should restart every time he sends a new communication. However, there's nothing in the law that supports that statement, and logic would strongly suggest that that can't be the rule because there's no limiting principle. If Mr. Kane sent an email today, what about in 10 years? Does that restart the clock every time? And what's in the record is that every communication is essentially the same one. Hey, are you going to file a grievance for me? No. Wait a little bit. I really think you should file a grievance for me. Already said no. That can't restart the clock every single time. And I see that I'm running out of time. Thank you very much for your time, Your Honors, and I submit. Okay, I'd like to touch on a few points. As I stated previously, the discharges are in the excerpts of record 360 through 373, so my colleague is incorrect. The council gave you the argument that when the ship's in Japan, are you going to apply Japan law? That's the issue because nature of a pilot or transportation workers, they're going from state to state or in international. You're not going to apply Japan law, or if you're in Arizona for one day, you're not going to apply Arizona law. You're going to apply the law of the forum where you were. So they, he accepted the, he actually went from California because the job was available in Hawaii to pull the job from Hawaii. So okay, he got the assignment in Hawaii, but he reported that's his home base in Long Beach. And the fact is, is that there were three tours on this job. So during the on the high seas, and that's where the bullying took place. The fact that we talked about ratification, the December 9th letter that's in the record and attached to the second amended complaint, it is a ratification of the final ratification. Nowhere in the CBA is there any discipline for two years banning from shipping out. You can be terminated and then ship out the next day, but this is two years, that's the final ratification. With respect to the bullying that there's a Jones Act claim that incorporates field of the rail workers. That's how Jones Act was passed. However, there's no physical injury allegation in this case. Okay. In other words, it's a wrongful termination. And then, of course, there is intentional sexual and emotional distress defamation. Those are not Jones Act claims. So I can't say that there's a Jones Act claim here. In fact, the whole idea that ARCO versus Campbell, what it says, it was designed to protect California residents. It says that that was what the purpose is. That's what the purpose is. And that was echoed in our reply brief on Malloy on page five of our brief. So you have to recognize that the final act of termination, of course, was here in California. He's a California resident. He, on page 28 of our opening brief, I list something like 14 things as a resident of California. He's in California, so the job was posted. And he went to Hawaii to get the job. He flew from Honolulu to report to work on the ship. He joined the ship in territorial waters. And it would be sort of unconscionable that when he passed 12 miles out to sea, or three miles, he would be left without a remedy. I think the modern view is that you have to expand some protections. And there, with respect to the argument that his claim before the FEHA, where he got a letter of right to sue, that was also a claim under EEOC, because their departments are together. And we think we put that in our brief. Okay. If my colleagues have any questions, I think you've used your time. I think you've used up your time. Thank you. All right. Thank you very much, Your Honors. I appreciate it. Thank you, counsel, for your arguments. This matter is submitted for decision.
judges: TASHIMA, GRABER, SUNG